**NOT FOR PUBLICATION IN WEST'S HAWAII REPORTS OR THE PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000272
10-NOV-2022
12:18 PM
Dkt. 68 SO**

NO. CAAP-22-0000272

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF QH

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 19-00164)

SUMMARY DISPOSITION ORDER
(By: Ginoza, C.J., and Wadsworth and Nakasone, JJ.)

Appellant Father (**Father**) appeals from the Order
Terminating Parental Rights, entered on April 4, 2022, in the
Family Court of the First Circuit (**Family Court**).[1]  Father
appears to contend that the Family Court erred in finding that
Father would not be able to provide a safe family home for his
daughter (**QH**)[2] within a reasonable period of time.[3]  Father also
challenges findings of fact (**FOFs**) 57, 79, 90, 91, and 92, in the
Family Court's May 12, 2002 Findings of Fact and Conclusions of
Law.

---

[1]     The Honorable Andrew T. Park presided.

[2]     At the time of trial in March 2022, QH was two years and eight
months old and had entered foster custody ten days after birth.

[3]     Father's opening brief fails to comply in material respects with
Rules Expediting Child Protective Appeals Rule 11(a)(3) and Hawaiʻi Rules of
Appellate Procedure Rule 28(b)(4) and (7).  For example, the brief does not
state how the Family Court erred and does not present any argument regarding
the challenged FOFs.  Nevertheless, we have "consistently adhered to the
policy of affording litigants the opportunity 'to have their cases heard on
the merits, where possible.'"  Morgan v. Planning Dep't Cty. of Kauai, 104
Hawaiʻi 173, 180-81, 86 P.3d 982, 989-90 (2004) (quoting O'Connor v. Diocese
of Honolulu, 77 Hawaiʻi 383, 386, 885 P.2d 361, 364 (1994)).  We thus address
Father's arguments to the extent discernible.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Father's points of error as follows and affirm.

**I.**

We review Father's challenges to the Family Court's FOFs for clear error. In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001).

> A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." "'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

Id. (citations and ellipsis omitted). Unchallenged findings of fact are binding on appeal. In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002) (quoting Poe v. Haw. Labor Rels. Bd., 97 Hawaiʻi 528, 536, 40 P.3d 930, 938 (2002)).

We likewise review conclusions of law that present mixed questions of fact and law for clear error. See In re JM, 150 Hawaiʻi 125, 137, 497 P.3d 140, 152 (App. 2021). Accordingly:

> [T]he family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; . . . they are reviewed on appeal under the clearly erroneous standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

Id. (quoting Doe, 95 Hawaiʻi at 190, 20 P.3d at 623).

## II.

Father contests FOFs 57, 79, and 90-92. Each is addressed below.

## A. FOF 57

FOF 57 states:

> Father never completely acquired the basic parenting skills that would keep a child safe. Since the beginning of this case, Father could not grasp all of a baby's needs like feeding, consoling, or age-appropriate milestones.

FOF 57 is supported by FOFs 61, 65-78, and 80-83, which are unchallenged and thus binding on appeal. Specifically, these unchallenged FOFs provide examples of Father's failures to acquire basic parenting skills, which include: numerous no-shows to visitations with QH, failure to bring QH diapers, snacks, and drinks during visits, and twice leaving QH unsupervised at a playground.

FOF 57 is also supported by the following testimony of Department of Human Services (**DHS**) social worker Bruce Wallace (**Wallace**):

> Q. So given all of these services and education given to [Father] . . . why do you still have concerns about his parenting as a safety issue?
>
> A. Well, just the recent incidents and also the reports that I have discussed with Dr. Choy, that department is -- already has exhausted everything that we could give [Father].
>
> Q. Then given this -- the time that's elapsed and the services provided, what were your expectations of a parent who could provide a safe family home at this point?
>
> A. That he would be a parent that asked questions about his daughter, that innate ability that . . . drives parents to, one, to understand their child's daily life; about what is school like; what . . . time does she go to bed; what is her sleep patterns; what is -- she like to do; who are her friends; what she likes, what she dislikes. These are the things that -- innate ability that [Father] does not possess of being a parent.

Thus, the record contains substantial evidence from which a reasonable factfinder could have found it highly probable that FOF 57 was true. See In re JK, 149 Hawaiʻi 400, 409-10, 491 P.3d 1179, 1188-89 (App. 2021).

**B. FOF 79**

FOF 79 states:

> On March 21, 2022, Father gave [QH] two little balls during a [Parent-Child Interactive Therapy (**PCIT**)] session against the therapist's advice. [QH] put the balls in her mouth and almost choked on them. Fortunately, the resource caregiver noticed [QH]'s distress and intervened.

FOF 79 is supported by substantial evidence in the record. Specifically, at trial, Wallace testified that the resource caregiver had reported this incident to him, and that he (Wallace) had discussed the incident with Father and PCIT staff. Additionally, Dr. Choy testified that the choking incident occurred in his office; Dr. Choy's staff told Father not to give QH anything small that she could choke on; QH got two small objects from the toy box in the office; and Dr. Choy's staff took away the objects and made it clear to Father that QH should not have the small objects on her own. Father also admitted giving the two balls to QH and that he should not have done it.

Thus, the record contains substantial evidence from which a reasonable factfinder could have found it highly probable that FOF 79 was true. See JK, 149 Hawaiʻi at 409-10, 491 P.3d at 1188-89.

**C. FOFs 90-92**

FOFs 90-92 state:

> 90. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to avoid foster placement of [QH] and she has been in the same placement since she was released from the hospital.
>
> 91. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to reunify the Child with [Father] and [Mother] by identifying necessary, appropriate, and reasonable services to address their identified safety issues, and making the appropriate and timely referrals for these services.
>
> 92. Under the circumstances presented by the instant case, the DHS gave Parents every reasonable opportunity to succeed in remedying the problems which subjected the Child to substantial risk of being harmed in the family home, and to reunify with the Child. The DHS actively encouraged [Father] and [Mother] to participate in necessary and reasonable services to allow them to reunify with the child.

FOFs 90-92 are also supported by substantial evidence in the record.  Specifically, Father does not contest FOFs 93 and 94, which state:

> 93.  Each of the service plans offered by the DHS and ordered by the court were fair, appropriate, and comprehensive.
>
> 94.  None of the underlying facts and data upon which the DHS based its opinions, assessments, and recommendations was shown to be untrustworthy.  The DHS' continuing assessment in this case was conducted in an appropriate manner.

FOFs 90-92 are also supported by Wallace's trial testimony.  Wallace testified as follows regarding DHS's efforts to reunify QH and Father:

> Q.    What types of services has [the] department put into place to address [parenting] issues?
>
> A.    Sure.  At . . . the beginning of the case we have hands-on parenting.  We've referred him to hands-on parenting, Strong Families Home Visiting.  He was doing that.  He was inconsistent with that and they closed him out.
>
> Also, he had the opportunity to do the ABC Program, which is evidence-based program, which he did not -- he was inconsistent with that and he was closed out of that.
>
> We also did parenting education with [Comprehensive Counseling and Support Services], with Parents Inc.  He did complete that.
>
> We also did another hands-on parenting with Catholic Charities.  We did that.  And also we -- right now currently we are doing PCIT.

Wallace further testified that DHS had exhausted all of its services that would help Father resolve safety issues; Father had not shown any improvement on these issues; Father was still not providing for all of QH's needs during their visits; and, because of Father's inconsistency, Wallace was concerned that Father "may forget her at some place, maybe at school[.]"  Wallace also expressed concern that:

> [Father] doesn't know his child.  He has never asked about her schooling, . . . her schooling schedule, her sleep time, her -- what's it like to be at the resource caregiver's home, who she plays with.  That drive that wants to know everything about your child, or everything that's -- might be wrong about . . . what we're doing wrong, or anything that he has concerns about during, say, if she went

5

to a water park and he didn't know about it or something like that. Or disagreed with something. He . . . has never asked us anything about that.

Thus, the record contains substantial evidence from which a reasonable factfinder could have found it highly probable that FOFs 90-92 were true. See JK, 149 Hawaiʻi at 409-10, 491 P.3d at 1188-89.

**III.**

Father's primary contention appears to be that the Family Court erred in determining that he would not be able to provide a safe family home for QH within a reasonable period of time.

HRS § 587A-33(a) (2018) provides, in relevant part:

(a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

(1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan; [and]

(2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care[.]

HRS § 587A-7(a) (2018) sets forth numerous factors that the Family Court must consider "when determining whether a child's family is willing and able to provide the child with a safe family home[.]"

Here, the Family Court entered extensive findings of fact related to Father's willingness and ability to provide QH a safe family home. The FOFs describe, among other things, QH's age and vulnerability; the reports of harm and threatened harm to QH; the results of Father's psychological evaluation; Father's failure to completely acquire the basic parenting skills to keep a young child safe; Father's inconsistency in demonstrating an understanding of and involvement in services recommended by DHS as necessary to provide QH with a safe family home; Father's

6

failure to resolve safety issues within a reasonable period of time; and DHS's assessment of Father's ability to provide QH with a safe family home.  In addition, uncontested witness testimony established that DHS provided Father with reasonable opportunities to demonstrate his ability to provide a safe family home for QH, but Father inconsistently participated in visitations with QH (missing at least thirty-one scheduled visits), family training courses, and psychiatric sessions, which ultimately led DHS to seek to terminate Father's parental rights.

Based on the entire record, we conclude that the Family Court did not clearly err in determining that Father was not presently willing and able to provide QH with a safe family home, even with the assistance of a service plan.

## IV.

For the reasons discussed above, the Order Terminating Parental Rights, entered on April 4, 2022, in the Family Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawaiʻi, November 10, 2022.


On the briefs:

Herbert Y. Hamada
for Father-Appellant.

Gay M. Tanaka and
Julio C. Herrera,
Deputy Attorneys General,
for Petitioner-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Karen T. Nakasone
Associate Judge